EMILY FAITHFUL AMES *et al.*

*v.*

KNOWLTON L. AMES *et al.*

*Filed at Ottawa January 16, 1894.*

1. PARTITION—*adult's right to partition.* An adult tenant in common has an absolute right to a partition of land held by him and his co-tenants, and the court has no right to take into consideration the question whether the continuance of the joint ownership of the land will or will not be to his advantage.

2. SAME—*by infant tenant in common.* Where a court of equity is called upon to partition lands in behalf of infants, it is the duty of

21—148 ILL.

the court to inquire whether the partition, if granted, will result bene-
ficially to the minor, or to his detriment; and if, upon investigation,
it turns out that a partition is not for his best interest, then a partition
should be denied.

3. SAME—*appointment of receiver pending litigation.* Pending the
litigation on a bill for the partition of real estate, the court has ample
power, upon a proper showing, to appoint a receiver to take charge of
the property and rent the same, collect rents and look after the interest
of the parties.

4. SAME—*receiver—bill by minors.* On bill by infants for the par-
tition of lands used for mining and farming purposes, a receiver was
appointed, on the application of the adult tenants in common, to take
charge of the property, who, under the direction and order of the court,
leased the same for a series of years, and during the minority of the
complainants, to the adult defendants, who were to be paid for oper-
ating the mine and other business, including the running of a store in
connection with the mine. This was done without the consent of the
minors or their guardian : *Held,* that the decree was erroneous.

5. SAME—*sale of property as an entirety.* Where property sought to
be partitioned among tenants in common, part of whom are infants,
consists of mining lands and machinery for operating the mines there-
on, and is not susceptible of division without prejudice to the interests
of the owners, it should be ordered to be sold as an entirety.

6. PROBATE COURT—*its powers.* Under our statute the probate court
is clothed with jurisdiction in all matters of probate, the settlement of
the estates of deceased persons, the appointment of guardians and
conservators, and the settlement of their accounts.

7. CHANCERY—*jurisdiction of estates of deceased persons and of wards.*
A court of equity will not take upon itself the administration of estates
of deceased persons, or the management of the estates of wards, after
the grant of letters, and thus supersede the probate court, except in
extraordinary cases and for special reasons.

8. SAME—*jurisdiction in matters of guardianship.* Where the pro-
bate court first obtains jurisdiction of the estate of an infant by the
grant of letters of guardianship, it will retain the same after the filing
of a bill for partition of the ward's lands, and if found advisable to lease
the property sought to be divided, the guardian, under the direction
of the probate court, will have ample power to act as respects the in-
terest of the minor; and the fact that the adult tenants in common
may refuse to co-operate with the guardian, so that the entirety of any
portion of the property can not be leased, will not afford a sufficient
reason for a court of equity to interfere, and oust the probate court of
its jurisdiction by appointing a receiver.

9. GUARDIAN AND WARD—*duties of guardian.* Under chapter 64 of the statutes it is the duty of a guardian to loan the money of his ward on security to be approved by the probate court, and to lease the real estate of the ward upon such terms and for such length of time, not beyond the majority of the ward, as shall be approved by the probate court.

10. The property and funds of infants should be invested where the principal will be absolutely safe, and where there may be a certainty of income. Where their property is unproductive, courts of equity may, upon a proper showing, order a sale, and the proceeds invested in productive property. So unproductive property may be improved by the construction of buildings thereon by the authority and direction of courts of equity.

11. WRIT OF ERROR—*by a next friend different from the one bringing original suit.* A writ of error being the commencement of a new suit, a minor complainant is not bound to prosecute the same by the person named as next friend in the circuit court, but a different person may be selected by the minor, and the selection of another person as next friend is no valid ground for a dismissal of the writ of error.

12. APPEAL—*when a freehold is involved.* Where a bill is filed for the partition of lands a freehold is involved, and an appeal to the Appellate Court in such case is properly dismissed for want of jurisdiction.

13. SAME—*when decree is final.* A decree of the circuit court, on bill for the partition of lands, which denies absolutely a partition of a part of the lands and directs partition of the other lands, is so far final as to authorize an appeal or writ of error to review the same.

APPEAL from the Appellate Court for the First District, and writ of error to the Circuit Court of Cook county; the Hon. O. H. HORTON, Judge, presiding.

This was a bill in the circuit court of Cook county, brought by Emily Faithful Ames and Miner T. Ames, minor children of Miner T. Ames, deceased, being of the age of about four and six years, respectively, by their mother, Irene C. Ames, as next friend, against Knowlton L. Ames, Jane Rose Ames Ross and Harriet C. Ames, adult children of said Miner T. Ames, deceased, and Irene C. Ames, the widow, and as administratrix, asking for partition among the heirs of Miner T. Ames, deceased, and for the assignment of dower of Irene C.

Ames, the widow, of all the real estate of which Miner T. Ames died seized, and for assignment of homestead.

Miner T. Ames, the father, died intestate on January 13, 1890, leaving him surviving, his widow, Irene C. Ames, who was his second wife, and the following children, viz. : Knowlton L. Ames, Jane Rose Ames Ross, Harriet C. Ames, children of a former marriage, and Emily Faithful Ames and Miner T. Ames, children of his second marriage. He died seized of the following real estate : His residence on Prairie avenue, in the city of Chicago, worth about $75,000, and one or two other small pieces of real estate, of the value of about $5000, in the city of Chicago. He was also seized, at the time of his death, of about 655 acres of farm land in Marshall and La-Salle counties, at and near Caton, Illinois, which was underlaid with coal, and of the value of about $42,000, and of about 400 acres at Braidwood, Illinois, also underlaid with coal, and of the value of about $10,000. He also owned, at the time of his death, a coal mine at Minonk, Woodford county, consisting of about 1300 acres of land contiguous to the city of Minonk, of about 113 acres of lots within the city of Minonk, and of about 1112 acres of mining rights, so-called, contiguous thereto. The mine was fully opened through a mining shaft, and was fully equipped and in good working order and condition at the time of Ames' death, the equipment consisting of boilers, engines, operating shaft, air shaft, railroad tracks in mine, pit cars, and other appurtenances. Adjoining the shaft of the mine Ames had also erected works for the manufacture of drainage tile, with all the machinery and appurtenances necessary, which had been conducted by him in connection with the mine, the same engines boilers and apparatus being used for both mine and tile works. There were also seventy-nine tenement houses in connection therewith, occupied by the miners in the employ of the mine and tile works, and also a store house, in which was conducted a store, at which the employes traded. It appears from the evidence that the coal

mine, and the mining rights, lots and lands, and all the appurtenances, including the entire plant, were worth in the neighborhood of $270,000.

The three children Knowlton L. Ames, Jane Rose Ames Ross and Harriet C. Ames were all of age. Ames, at the time of his death, left personal property, and his widow was appointed administratrix by the probate court of Cook county. The bill was filed July 10, 1891, and on the same day the widow, Irene C. Ames, entered her appearance and put in an answer, in which she admitted the allegations of the bill, and consented to the rendition of a decree granting the relief prayed for in the bill. The three adult children, defendants, also put in an answer to the bill, in which they admitted the death and heirship of Miner T. Ames, as alleged in the bill; that letters of administration were granted to Irene C. Ames; that the said Miner T. Ames was seized of the property described in the bill, at the time of his death. The answer also set out the facts in regard to the coal mine at Minonk, the store, tile factory, and lands used in connection therewith. It also alleged that at the time of the death of Ames the mine, tile works and store were being conducted by him, and since his death the business has been carried on by Irene C. Ames. The defendants also set up, in their answer, that if the lands at Minonk are partitioned, as prayed for in the bill, they can not be successfully mined, and they further say, that if partitioned it will result in serious injury to the value and producing capacity of said lands, and that in order to the successful conduct of the business of said tile factory and coal mine, with their appurtenances, the property should be kept as an entirety, and so managed; that all the lands are rented for farming purposes, at about four dollars per acre, excepting the lands at Braidwood; that it would be impossible to divide the lands among the parties interested, so as to give each one a portion equal in value with the others, without dividing said mining property and said coal lands at Caton and Braidwood

into two or more parcels; that the peculiar value of said lands is in the coal thereunder, and that such value depends largely upon the lands being occupied as a whole; that all of said lands are more valuable for the purpose of mining than for any other purpose, and are increasing in value every year, and are yearly yielding large sums for farming purposes; that it will be impossible to make partition of said premises without manifest prejudice and injury to the owners, and that the same would have to be sold, which would be prejudicial to the interests of the minor complainants as well as the defendants.

The defendants also filed a cross-bill, in which they set up substantially the same facts contained in the answer. It is also alleged therein that it is for the best interest of all concerned that the business at Minonk should be carried on, without interruption, during the litigation, and requests the appointment of a general manager of the business. They also allege that if the mine and tile factory should be stopped it would constitute a waste and destruction of the property, and result in irreparable damage. The cross-bill prayed that a manager be appointed by the court to conduct and take charge of the business, with power to take possession of the lands and to lease them, to collect the rents, issues and profits thereof, and to pay the taxes and other expenses, and to operate, manage and conduct the said mining and tile business, and said store, coal cars and other property mentioned. There was also a prayer in the cross-bill for general relief.

The circuit court referred the cause to the master in chancery, to take proofs on the question whether it was for the benefit and interest of the infant complainants that the property described in the bill should be partitioned, and report the evidence and his conclusions to the court. Under the decree of reference the master took the evidence and filed his report, in which he finds the value of the entire estate to be $400,000. He also found that "the property known as the mining property, consisting of the shaft, machinery and works, including

the tile works and tenements, pit cars and fixtures, lots in Minonk, 1900 acres of mining rights, and about 100 acres adjoining the mining shaft, estimated upon the basis of the value fixed by the witnesses, I would estimate at about the sum of $165,000." The master, among other things, also found as follows: "That such business has been fairly well managed, and has been profitable, since the death of Miner T. Ames, but I conclude and find that it is not to the interest of the minors to continue such business, because of the perils and hazards thereof, because of the fact that their entire capital is at all times liable to exhaustion or impairment by the natural losses and risks incident to the business, because of the limitations upon the credit and authority of the receiver and the difficulty a court of equity would have in conducting such business, and because, as a matter of law, I am of opinion that a court of equity can not, in view of the generally established policy of the law, both through statutes governing guardians and the decisions of the courts of equity governing trustees in their investments of the funds of wards, permit or authorize the continuance of such business with the ward's estate. I therefore respectfully report that it is not to the interest of such minors that the property described in the bill of complaint herein should be kept together and operated as a business, but it is to their interest that such property should be partitioned or sold, as to this court may hereafter appear advisable, and I therefore respectfully recommend that the suit should proceed in the ordinary course of the law."

On the 22d day of June, 1892, after the report of the master had been filed, by leave of court, Irene C. Ames withdrew as next friend of Emily F. and Miner T. Ames, the complainants in the original bill, and John E. Seinworth was appointed as next friend and guardian *ad litem.* On the same day the court appointed the Chicago Title and Trust Company receiver of the mine and substantially all other property belonging to the estate of Miner T. Ames, deceased. The receiver was

authorized to operate and conduct the mine, tile works and store, and the business theretofore carried on, until the further order of the court; to rent any portion of the real estate from year to year, etc.

On June 23, 1892, the three adult heirs filed in court their written proposition to lease all the Minonk property during the minority of the minor complainants, and for the purchase of certain cars and other personal property of the estate. On the same day the court entered a decree, which, after reciting the proposition, finds that it was not in the interest of the minors that the real estate and mining interests located in or near Minonk should be partitioned. The decree then proceeds: "It is therefore ordered, adjudged and decreed by the court, that said Chicago Title and Trust Company execute and deliver a lease unto said adult heirs of the real estate described under numbers 1, 2 and 4, (being the farms, town lots, mine, shaft, machinery, buildings and plant at and near Minonk,) and permit and authorize said Knowlton L. Ames, Jane Rose Ames Ross and Harriet Chaffee Ames to take actual possession of the same, and to conduct the business of mining coal, and making tile, and conducting the store, and renting the tenement houses above referred to, and cultivating or renting said farms, as the same was heretofore conducted, and that said receiver make and deliver a bill of sale of all said Ames cars, and of the goods, wares and merchandise above referred to, and deliver possession thereof unto said adult heirs; that said adult heirs shall also execute said lease, and the agreement first aforesaid shall be set out and recited in said lease, and, concurrently therewith, said adult heirs, with said Walter W. Ross, the husband of said Jane Rose Ames Ross, shall execute and deliver a trust deed to the Chicago Title and Trust Company, as receiver, as security for the performance of the agreements above recited."

Under this decree a lease was executed and approved by the court, and the court decreed partition of the remainder of

the real estate, and appointed commissioners to make the partition. The proposition submitted was as follows:

"That they will take a lease of all the real estate at and near Minonk, described under description one (1), two (2) and four (4), including the mine, tile works and tenements, also all machinery connected with the said mine and said tile works, and pit cars and railway tracks in said mine, and the fixtures and appurtenances used in the operation of said mine and tile works, and all personal property in and about said mine to be used in connection therewith, viz., mules, tools and supplies for the mine, and other property strictly connected with or used in the operation of the said mine and tile works, and will conduct the business of mining and making tile as heretofore conducted in, under and upon all said property, and have said farms cultivated as heretofore; and in consideration thereof they agree to guarantee to the minor heirs aforesaid, or their guardian, the payment to such guardian for each minor, quarterly, of a sum equal to one-fifth of six per cent per annum, based upon the valuation of said mining property, etc., viz., upon the sum of one hundred and sixty-five thousand dollars ($165,000), and also the payment to such guardian for each minor, annually, of a sum equal to one-fifth of the net income which may, during any year, be produced out of said mine, tile works, store and tenement houses aforesaid, over and above six (6) per cent of the valuation aforesaid, the taxes and assessments to be first deducted as part of the expenses; and they also agree to pay to the guardian of each of said minors, quarterly, in equal quarter payments from the date of said lease, as and for his or her net income of said farm, a sum equal to one-fifth of five per cent per annum, based upon said valuation of one hundred and five thousand dollars ($105,000), said adults to pay all taxes and assessments upon all of said property and to keep the same in as good repair as at present. They also agree that the machinery and plant pertaining to said mine

and tile works, and the tenement houses and storehouse aforesaid, shall be kept in good order by them, and the expenses necessary therefor shall be deducted before making the division of such profits, and they agree that the machinery and plant shall be left in as good condition at the termination of such agreement as they are at the present time. They also agree to furnish money to operate the mine, tile works and store aforesaid, and to conduct the business as heretofore, they to be allowed for the minors' share of the money so advanced, interest at the rate of six (6) per cent per annum upon all money furnished by them individually for such purpose, which interest shall form part of the expenses of running said business. They also stipulate that such business shall be conducted by said adult heirs, or their agents, under the supervision of such receiver, and as may be directed, from time to time, by the court, and that they will account to such receiver for all such business. And the said adult heirs stipulate that said Knowlton L. Ames shall give his whole time in and about the said business, and shall receive such salary for his services in the general management of said business under said receiver as may be allowed by the court, but not to exceed the sum of two hundred dollars (\$200) per month for the first three years, which shall constitute a part of the running expenses of said business."

The stipulation also provided that the arrangement shall continue until said minors shall respectively arrive at their majority; that they will render, or cause to be rendered, a monthly statement of said business of conducting the management of said mine, tile works, tenement houses, store and farms to said receiver, who shall render an account quarterly to this court; that the undersigned hereby agree to purchase of said receiver all the Ames cars, so-called, and pay therefor the sum of \$12,000; and they also agree to purchase of said receiver the goods, wares and merchandise in the said Ames store at Minonk, and the tile so in possession of said receiver,

and pay therefor the cost price thereof; and they also offer to purchase the other personal property at Minonk not embraced in the aforesaid valuation of $165,000, excepting the Norman horses and choses in action, and to pay therefor the full value thereof to be ascertained, but such amount not to be paid over until the accounts in said cause shall be adjusted hereafter under order of said court, and said amounts shall be charged against them on such accounting.

The proposition contained other matters, but it will not be necessary to state them here.

Mr. GEORGE W. SMITH, for the appellants and plaintiffs in error:

The decree is final. There can not, at least, be any question as to the finality of that part of it which directs the lease of the Minonk property and orders a sale of the. personalty. Nothing further remained to be done on the part of the court to carry this part of the decree into effect, and by its operation plaintiffs in error were deprived of property and property rights. Whenever a decree has this effect it is appealable. *Allison* v. *Drake,* 145 Ill. 500; *Burnham* v. *Insurance Co.* 79 id. 160; *Blake* v. *Blake,* 80 id. 523; *People* v. *Prendergast,* 117 id. 588; *Dickenson* v. *Codwise,* 11 Paige, 189; *Forgay* v. *Conrad,* 6 How. 202; *Thomson* v. *Dean,* 7 Wall. 342; *Railway Co.* v. *Express Co.* 108 U. S. 24; *Iron Co.* v. *Meeker,* 109 id. 180; *Williams* v. *Morgan,* 111 id. 684; *In re Farmers' Loan and Trust Co.* 129 id. 206; *Trust Co.* v. *Grant Locomotive Works,* 135 id. 207; *Barry* v. *Briggs,* 22 Mich. 201; *Taylor* v. *Sweet,* 40 id. 736.

Equity will not take jurisdiction from the probate court unless special reasons exist. *Freeland* v. *Dazey,* 25 Ill. 294; *Harding* v. *Shepard,* 107 id. 273; *Winslow* v. *Leland,* 128 id. 304; *Shepard* v. *Speer,* 140 id. 238; Woerner on Law of Administration, secs. 149, 156.

That the probate court had authority over the subject is apparent from the statute and authorities relating to its powers in guardianship matters. Rev. Stat. chap. 64; *Bond* v. *Lockwood*, 33 Ill. 212; *Wadsworth* v. *Connell*, 104 id. 369; *Mortgage Co.* v. *Sperry*, 138 U. S. 313.

Where the jurisdiction of the probate court has once properly attached, no other court will interfere or go behind its judgments or decrees without special and sufficient reasons. Woerner on Law of Administration, 357, and cases cited.

The leading general principle as to courts of concurrent or co-ordinate jurisdiction is, that whichever court of those having jurisdiction first acquires possession of a cause will retain it throughout. Wells on Jurisdiction, sec. 156; 12 Am. and Eng. Ency. of Law, 292, and cases cited; *Mail* v. *Maxwell*, 107 Ill. 554; *Whitney* v. *Stevens*, 97 id. 482; *Mason* v. *Piggott*, 11 id. 85.

Mrs. Ames having been appointed guardian, the court had no right to supersede her, as no cause was shown. Schouler on Domestic Relations, sec. 316.

That the employment of trust funds in trade or speculation or in a manufacturing establishment is considered a gross breach of trust, and never sanctioned by a court of equity, is a proposition too well established to be seriously questioned; and yet, what difference is there between investing the moneys of these infants in such a business, and using their property therein? Perry on Trusts, sec. 454, *et seq.*; 3 Pomeroy's Eq. Jur. sec. 1071, *et seq.*; Schouler on Domestic Relations, sec. 353.

The infants were entitled to partition as a matter of right. Rev. Stat. chap. 106, secs. 1, 3, 5, 21; *Hill* v. *Reno*, 112 Ill. 154; *Freeman* v. *Freeman*, 9 Heisk. 301; *Willard* v. *Willard*, 145 U. S. 116; *Thorington* v. *Thorington*, 82 Ala. 489; Freeman on Co-tenancy, sec. 433.

Messrs. PENCE & CARPENTER, Messrs. LYMAN & JACKSON, and Mr. WALTER W. Ross, for the appellees and defendants in error :

The appeal from the Appellate Court should have been dismissed, because not prosecuted by the next friend appointed by the circuit court. Rev. Stat. chap. 22, sec. 5; chap. 64; *Patterson* v. *Pullman*, 104 Ill. 80; *Roodhouse* v. *Roodhouse*, 132 id. 362; *Simpson* v. *Alexander*, 6 Cold. 629; *Stinson* v. *Pickering*, 70 Me. 275.

An appeal or writ of error will not lie except from the final judgment or decree. *Woodside* v. *Woodside*, 21 Ill. 207; *Gage* v. *Eich*, 56 id. 297; *Railroad Co.* v. *Trust Co.* 70 id. 249; *Hunter* v. *Hunter*, 100 id. 519; *Young* v. *Zinc Co.* 105 id. 26; *Farson* v. *Gorham*, 117 id. 137; *Green* v. *Fisk*, 103 U. S. 518; *Iron Co.* v. *Martin*, 132 id. 91; *Bostwick* v. *Brinkerhoff*, 106 id. 3; *Craighead* v. *Wilson*, 18 How. 199.

On bill for partition of lands a freehold is involved. *Bangs* v. *Brown*, 110 Ill. 96; *Johnson* v. *Johnson*, 7 Bradw. 521; *Lequatte* v. *Drury*, 6 id. 389; *Walker* v. *Rand*, 31 Ill. App. 636; *Magoon* v. *Magoon*, 15 id. 629; *Sandford* v. *Kane*, 127 Ill. 591; *LeMoyne* v. *Harding*, 132 id. 78; *Hart* v. *Burch*, 31 Ill. App. 22; *Rohn* v. *Harris*, id. 26; *Goodkind* v. *Bartlett*, 136 Ill. 18.

It is the peculiar duty of a court of equity to protect the rights of infants. *Hartman* v. *Hartman*, 59 Ill. 103; *Davidson* v. *Bowden*, 5 Sneed, 129; *Johnson* v. *Noble*, 24 Mo. 252; Freeman on Partition, sec. 457; *Lee* v. *Lee*, 55 Ala. 595; *Cowls* v. *Cowls*, 3 Gilm. 435; *Smith* v. *Sackett*, 5 id. 534; *Lynch* v. *Rotan*, 39 Ill. 140; *Allman* v. *Taylor*, 101 id. 185; *Grattan* v. *Grattan*, 18 id. 167.

This mine was incapable of partition. The rule of law is, that mines, when opened, are indivisible, and partition by metes and bounds is not permissible. The only partition that can be made is to order a sale, and divide the proceeds. *Lenfers* v. *Henke*, 73 Ill. 405; *Conant* v. *Smith*, 1 Aiken, 67;

*Adams* v. *Briggs*, 7 Cush.. 361; *Kemble* v. *Kemble*, 44 N. J. Eq. 454; *Franklinite Co.* v. *Condit*, 19 id. 394; *McGillivray* v. *Evans*, 27 Cal. 92; *Locey Coal Mines* v. *Coal Co.* 131 Ill. 10.

The right of a court of equity to care for the estate and act in the interest of infants is well established by the authorities cited under our first point, and we especially call the attention of the court again to the case of *Lee* v. *Lee*, 55 Ala. 590. We also call the attention of the court to the following cases: *Goodale* v. *District Court*, 56 Cal. 26; *Duncan* v. *Campau*, 15 Mich. 415; *Pignolet* v. *Bushe*, 28 How. Pr. 9; *Weise* v. *Welch*, 30 N. J. Eq. 431; *Jefferys* v. *Smith*, 1 Jac. & W. 298; *Smith* v. *Lyster*, 4 Beav. 227; *Sandford* v. *Ballard*, 33 id. 401; *Hargrave* v. *Hargrave*, 9 id. 549; Beach on Receivers, secs. 489, 490; Freeman on Co-tenancy, sec. 327; High on Receivers, sec. 607; High on Injunctions, secs. 344, 693; 3 Pomeroy's Eq. Jur. sec. 1332; *Oxenden* v. *Lord Compton*, 2 Ves. Jr. 69; *Cecil* v. *Salisbury*, 2 Vern. 223; *In re Salisbury*, 3 Johns. Ch. 347; *Hedges* v. *Ricker*, 5 id. 163; *Inwood* v. *Twyne*, 1 Ambl. 419; *Lord Winchelsea* v. *Norcliffe*, 1 Vern. 403; *Dennis* v. *Dennis*, 15 Md. 73; *Bond* v. *Lockwood*, 33 Ill. 212; *Kingsbury* v. *Powers*, 131 id. 183; Chambers' Ch. Jur. of Infants, 504, 505, 507, 508, 525.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

To reverse the decree of the circuit court the complainants in the bill appealed to the Appellate Court, where, on motion, the appeal was dismissed. Complainants then took an appeal to this court, and the first question presented is, whether the Appellate Court had jurisdiction to entertain the appeal. The bill was brought for the partition of lands, and this court has held in a number of cases that a freehold is involved in a proceeding of this character. (*Carter* v. *Penn*, 99 Ill. 390; *Bangs* v. *Brown*, 110 id. 96.) As a freehold was involved the Appellate Court had no jurisdiction, and the judgment dismissing the appeal was correct.

It is also insisted that the writ of error should be dismissed, upon the alleged ground that the decree of the circuit court is not final. The decree denied absolutely a partition of the Minonk property, and the other lands were decreed to be divided, and commissioners appointed to make the partition. We think the decree was final, so far, at least, as to authorize an appeal or writ of error. This view is fully sustained by *Allison* v. *Drake*, 145 Ill. 500, where the same question arose. In deciding the case it is there said: "We are of the opinion that the decree is final, so as to authorize an appeal to this court. * * * A final decree is not necessarily the last order in the case, as orders sometimes follow merely for the purpose of carrying out or executing the matters which the decree has determined, but when it finally fixes the rights of the parties it is final, and may be reviewed on appeal or writ of error. * * * This is done in the present decree, and the proceedings under the order of reference are only in the nature of an execution of the decree."

It is also claimed that the writ of error should be dismissed because not prosecuted by the next friend appointed by the court. Irene C. Ames, the mother of the complainants, as next friend, filed the bill in the circuit court. On June 20, 1892, Irene C. Ames was withdrawn as next friend and John E. Seinworth was appointed by the court, but this writ of error was sued out in the name of the minor complainants by John K. Cowan, their next friend. The prosecution of this writ of error was the commencement of a new suit. Section 5, chapter 22, provides that suits in chancery may be commenced and prosecuted by infants, by guardian or next friend, while section 3, chapter 106, entitled "Partition," provides that infants may petition by guardian or next friend. Under the statute we do not think the minor complainants were bound to prosecute the writ of error by the person named as next friend in the circuit court, but a different person might be selected if they thought proper, and the fact that a different

person has been selected as next friend to prosecute the writ of error is no valid ground for a dismissal of the writ. The motion to dismiss the writ of error will be denied.

Many questions have been discussed by counsel for the respective parties in the able arguments presented for our consideration, but in the view we take of the record it will not be necessary to consider all the matters raised and argued in the briefs, but we will content ourselves with considering such questions as we think must settle the rights of the parties in interest.

As will be observed, this bill was brought on behalf of minors, for partition, and it is claimed, on the one hand, that as a matter of right they are entitled to a partition of the lands involved, while, on the other hand, it is claimed that a court of equity has a discretionary power to grant or refuse the relief prayed for, as the court may think for the best interest of the minor complainants, in view of the evidence presented by the parties bearing on the question.

Section 1, chapter 106, of the Revised Statutes, entitled "Partition," reads: "When lands, tenements or hereditaments are held in joint tenancy, tenancy in common or coparcenary, whether such right or title is derived by purchase, devise or descent, or whether any or all of the claimants are minors or of full age, any one or more of the persons interested therein may compel a partition thereof by a bill in chancery, as heretofore, or by a petition in the circuit court of the proper county, or if the proceeding is in the county of Cook, in the circuit or Superior Court of said county."

It must be admitted, if this section of the statute is to be given a literal construction, all persons holding lands as tenants in common, whether infants or adults, would be entitled, as a matter of right, to obtain partition by bill in equity, because the statute so reads. We are not, however, inclined to place a construction on the statute which would compel a court of equity to award a partition where a bill is brought

by a minor, regardless of consequences. Where a bill is
brought by an adult he has an absolute right to partition, and
the court has no right to take into consideration whether the
continuance of the joint ownership of the lands would or would
not be to his advantage. But the protection of infants and
their estates is a duty enjoined upon courts of equity, when the
jurisdiction of such courts is invoked on behalf of infants or
their property. Where a court of chancery is called upon, by
a bill of equity, to partition lands in behalf of infants, it is the
duty of the court to inquire whether the partition, if granted,
will result beneficially to the minor, or to his detriment, and
if, upon investigation, it turns out that partition is not for the
best interest of the minor, then partition ought to be denied.
This view is well expressed by Freeman on Co-tenancy, sec.
457, as follows: "An adult, when not followed by special
obligations existing independent of the co-tenancy, has an
absolute right to partition, and the court to which the appli-
cation is properly presented has no authority to consider
whether the further continuance of the co-tenancy would
prove more or less advantageous than a partition. But the
protection of infants is one of the duties with which courts of
equity are specially charged. When the court to which an
application for partition is presented on behalf of an infant
is a court of equity, or one authorized, in matters of partition,
to exercise a chancery jurisdiction, it not only may but ought
to inquire whether the proposed partition will operate to the
prejudice or to the benefit of the infant petitioner, and if, as
the result of such inquiry, the conclusion is reached that the
partition will not prove beneficial, it ought to be denied."

In *Hill* v. *Reno*, 112 Ill. 154, it was held that partition was
a matter of right, and a court of equity was not clothed with
discretion to grant or refuse the relief. But in that case in-
fants were not before the court, and the decision had reference
to an application on behalf of adults.

The absolute right of partition, by bill in the name of infants by next friend, arose in *Hartman* v. *Hartman*, 59 Ill. 103, and the court held the right was not absolute in all cases. It is there said : "A general superintendence of infants is now exercised in courts of chancery, as a branch of general jurisdiction. Indeed, it is one of the peculiar duties of courts of equity to protect the rights of infants. From the earliest period, courts of chancery have been vested with a broad and comprehensive jurisdiction over the persons and property of infants. (*Cowls* v. *Cowls*, 3 Gilm. 435 ; *Grattan* v. *Grattan*, 18 Ill. 167 ; *King* v. *King*, 15 id. 187.) The power and duty of the courts in this regard are clearly shown by Judge Story, 2 vol. Eq. Jur. ch. 35. He says : 'Whenever a suit is instituted in the court of chancery, relative to the person and property of the infant, although he is not under any general guardian appointed by the court, he is treated as a ward of the court, and as being under its especial cognizance and protection.' This proceeding has been instituted in behalf of the minors. No-reason has been shown why partition should be granted. We can not perceive that it would be for the interests of the minors to grant the division."

There are cases holding a different rule, but we believe the law, as declared by this court, in harmony with the decided current of authority bearing on the question, and we perceive no reason why the court should depart from the rule of law heretofore established.

If the evidence in this case established the fact that the granting a decree of partition on behalf of the minor complainants would result prejudicially to them, and their property would be liable, as a result of a decree, to be sacrificed or lost, then the court, in the exercise of its chancery jurisdiction, was clothed with undoubted power to deny the relief and dismiss the bill. But, as has been seen, this course was not pursued. After a large amount of testimony had been taken and the master in chancery had filed his report, in which he

found that it was for the interest of the minors that partition be made or the property sold in the ordinary course of law, the court appointed the Chicago Title and Trust Company receiver of the real and personal property of the deceased, including one hundred and eighteen railroad coal cars. The receiver was authorized to operate and conduct the mine, tile works and store, and to rent any part of the real estate. This decree was entered on June 20, 1892. On June 23—three days later—the adult heirs filed in court a proposition in writing to lease all the Minonk property during the minority of the minors, and for the purchase of the railroad cars and certain other personal property, including the stock of goods and tile in possession of the receiver,—which proposition will be found in the statement. The court, in its decree, after reciting the proposition in detail, decreed that the receiver execute a lease to the adult heirs, of the Minonk property, according to the terms of the stipulation, and authorized them to take possession of the property, conduct the business of mining coal and making tile, conduct the store, rent the tenement houses and farms, and conduct the business as it had heretofore been conducted, and also that the receiver sell them the railroad cars and the stock of goods, etc. The decree also provided:

"And it is further ordered that said Knowlton L. Ames, as representative of all said adult heirs, shall, under the direction of said receiver, manage said business, and he shall be allowed therefor the sum of $200 per month for the period of three years from this date, as compensation for his services to be rendered, which shall constitute part of the expenses in the conduct of said business, and after the expiration of said three years he shall be allowed such sum for his services as the court may hereafter direct, and that said adult heirs shall make a statement monthly to said receiver of all their acts and doings in and about said business, and shall keep proper books of account, which shall at all times be open to the ex-

amination of said receiver; that said adult heirs shall be
subject to the direction of the court, from time to time, through
said receiver, and said receiver shall exercise supervision over
the management of such business, but it shall not be permit-
ted to change or interfere with the conduct thereof, except as
may be directed by the court; that said receiver shall not be
required to give its time and attention to the details of the said
business, but shall only have a supervision thereof as above
provided; and shall receive compensation at the rate of $500
per annum, until otherwise ordered by the court.    And it is
further ordered by the court that said adult heirs furnish all
money necessary to conduct said business, including said store
at Minonk, and that they be allowed interest upon such ad-
vances, which shall be charged as part of the expenses of said
business."

The appointment of a receiver in a partition proceeding is
not of frequent occurrence, but, pending the litigation, we
think the law is well settled that the court has ample power,
upon a proper showing, to make the appointment.    Freeman
on Co-tenancy, after discussing the question at some length,
(sec. 327,) concludes as follows: "In partition, the court will
appoint a receiver during the pendency of the action, to pre-
serve the complainants from serious loss, when it is shown
that they are unable to rent portions of the property, or to
collect rent of other portions rented, in consequence of the
conduct of the defendant."    Beach on Receivers (sec. 492)
says: "Whenever it appears, during the prosecution of a suit
between tenants in common or joint tenants, that a receiver
is necessary to protect the interests of all parties, the court
will, upon a proper application, appoint a receiver of the
property."

The appointment in this case, however, does not seem to
have been made to preserve the property pending the litiga-
tion between the co-tenants.    The decree contemplates that
the receiver was to be continued for sixteen or seventeen years.

The property of the complainants is by the decree taken out of their hands, and out of the hands of their guardian, who was appointed by the probate court, and placed in the hands of the receiver, and he is authorized by the decree to lease it to the adult co-tenants on certain specified terms and conditions, and thereafter supervise the business as conducted by them. In other words, a large portion of the estate of the minor complainants, without their consent or the consent of their legal guardian, is taken away from them and invested, during their minority, in farming, coal mining, manufacturing tile and selling goods at retail. Receiver's fees, and, of course, necessary attorney's fees to advise and direct the receiver, and court costs, are to be charged against their property, and they are to be charged with interest advanced by their co-tenants on moneys they may use in the business. Knowlton L. Ames, one of the adult heirs, is allowed $200 per month as manager of the business for the period of three years, and how much more after that period is not disclosed. There are doubtless many other charges this property will be required to pay if it should remain invested as provided by the decree. It is true that Ames, in his lifetime, conducted the business successfully, and the business has also prospered under the management of his widow; but it by no means follows that the court, acting through its receiver, aided by the adult co-tenants, will be able to carry on the business during the next sixteen or seventeen years in such a manner that the minor complainants may be able to realize a profit from the investment. Since this proceeding was commenced, as appears from the record, the tile works have been destroyed by fire. The same misfortune may overtake the store. Mining may prove unprofitable, and the demand for tile may cease. Accidents may result to the miners, for which those operating the mine may be compelled to respond in heavy damages. Other unforeseen misfortunes may overtake the enterprise in which the adult heirs and the receiver are about to engage under the

decree of the court, which may result injuriously to the property of the minors.

In view, therefore, of the nature and character of the risk, was the decree one which, under all the facts and circumstances, a court of equity ought to have rendered? The property and funds of infants should be invested where the principal will be absolutely safe, and where there may be a certainty of income. There may be cases, but we are aware of none, where a court of equity has authorized, by decree, the funds of minors to be invested in mercantile and manufacturing pursuits. Where minors own property producing little or no income, courts of equity may, upon a proper showing, order a sale and the proceeds re-invested in more productive property. So, also, minors' unproductive property may be improved by constructing buildings upon it, by the authority and direction of courts of equity. But cases which sanction such proceedings lend no aid to a decree authorizing a receiver of court to invest the property or funds of minors in a venture like the one here involved. It is a well-known fact that in many manufacturing plants much of the capital is invested in real estate, and if the rule was once established that courts of equity would take charge of minors' property descending to them from persons engaged in manufacturing business, and keep such property invested in the business during minority, through the instrumentality of receivers, courts would soon be filled with such cases. Courts of equity, in our opinion, are not organized for such a purpose.

It is claimed that the property is so situated that it can not be divided among the heirs, and a sale will result in a loss to the different owners. Whether the property can or can not be divided, is a question which can not be known until commissioners have been appointed and made an examination of the property and returned their report to the court. But should it turn out that the property was not susceptible of division, and a sale should be ordered, a court of

equity has ample power, in its decree, to guard the rights of the parties, so that their interests will not be sacrificed, but on a sale bring all that it may reasonably be worth in the market.

Attached to the master's report we find the following statement of the property embraced in the bill:

| | |
|---|---:|
| 1900 acres of mining rights, at $20 | $38,000 |
| 70 acres of surface adjoining shaft, at $100 | 7,000 |
| Shaft machinery and works | 75,000 |
| Pit cars and fixtures | 7,000 |
| | $127,000 |
| Lots in Minonk owned in fee | 8,000 |
| 1 tenement | 850 |
| 39 tenements, at $250 | 9,750 |
| 1 tenement | 800 |
| 29 tenements, at $400 | 11,600 |
| | $158,000 |
| Caton lands | 42,000 |
| Minonk farms, surface, at $90, 1200 acres | 108,000 |
| Braidwood | 10,000 |
| Mize=$5000, less life estate | 3,500 |
| Prairie avenue | 72,500 |
| | $394,000 |

The master also attached to his report, as a part thereof, the following offer made by Mrs. Ames, the widow of the deceased: "First, for the property enumerated in this statement, and valued at $158,000, if the dower of Mrs. Ames is awarded in gross or assigned to that property, Mrs. Ames will, if a sale shall be necessary, furnish a purchaser at that sum; second, for the property enumerated in this statement, and valued at $127,000, Mrs. Ames will furnish a purchaser at that sum if the sale shall be necessary, it being understood that her dower shall be awarded fairly, and assigned, but not necessarily in gross; third, for the performance of these offers she offers to give adequate security; fourth, if the mines shall be awarded to her children, she offers, within three months thereafter, to find a purchaser for the same, at a price to be fixed by the probate court."

This offer would seem to indicate that if the property was decreed to be sold it was not liable to be sacrificed for the want of bidders.  But disregarding this offer entirely, we apprehend there would be no trouble, should it become necessary to decree a sale of the property, if the rights of the parties are properly guarded in the decree and the Minonk mining property sold as an entirety, which should be done, to sell it for all that it is reasonably worth.  Common observation will demonstrate the danger of loss to persons of experience, skill and business ability, who are engaged in mercantile and mining business with large capital and good credit.  Why, then, should the property of these minors be invested for seventeen long years in a business to be managed by one of the co-tenants, who, so far as appears, has had no experience whatever, and no capital except his interest in the estate of the deceased?  It seems apparent to us that a court of equity should not lend its aid or give its sanction to an investment of minors' property in a business so likely to result in loss and disaster.

It appears that on the 9th day of November, 1891, before any action was taken by the circuit court in regard to the control of the minors' property, Irene C. Ames was appointed, by the probate court of Cook county, guardian of the minors, and qualified as such.  Under our statute the probate court is clothed with jurisdiction in all matters of probate, settlement of the estates of deceased persons, appointment of guardians and conservators, and the settlement of their accounts.  (*Shepard* v. *Speer*, 140 Ill. 244.)  Under chapter 64 of the statute it is the duty of the guardian to loan the money of the ward on security to be approved by the probate court, and to lease the real estate of the ward upon such terms, and for such length of time not beyond the majority of the ward, as shall be approved by the probate court.  Here the probate court had acquired jurisdiction over the guardianship.  The guardian who had been appointed by that court had ample authority,

under its direction and approval, to lease the minors' property upon such terms and conditions as might be thought for the best interest of the minors' estate. There are cases where a court of equity may take upon itself the administration of estates; but, as held in *Freeland* v. *Dazey,* 25 Ill. 296, a court of chancery will not exercise this jurisdiction except in extraordinary cases, where some special reasons are shown to exist why the administration should be withdrawn from the probate court. So in *Harding* v. *Shepard,* 107 Ill. 273, it was held that a court of chancery will not, except in extraordinary cases, supersede the probate court in the administration of an estate. So far as appears, no reason existed why the control of the minors' property in this case should be taken from the jurisdiction of the probate court and transferred to the circuit court.

But it is said the circuit court acquired jurisdiction before the probate court appointed a guardian. The bill in this case was filed July 10, 1891, and the guardian was appointed by the probate court November 9, 1891. Upon looking into the record it will be found that the bill was brought merely for partition and assignment of dower. The complainants did not ask for the appointment of a receiver, or that the property should be leased. That element was brought into the case by the cross-bill of the defendants the adult heirs, filed on the 7th day of January, 1892,—two months after the probate court had appointed a guardian and the guardian had duly qualified. When, therefore, the probate court assumed jurisdiction of the guardianship the circuit court had not taken jurisdiction, and the probate court having first obtained jurisdiction was entitled to retain it, unless some special reason should be shown why the guardianship should be withdrawn from the probate court. If it was thought advisable to lease the mine, or the tile works, or the tenement houses, or the farming lands, or any other portion of the property, the guardian, under the direction of the probate court, had ample

power to act as respects the interests of the minors, and if the adult heirs refused to co-operate with the guardian, so that the entirety of any portion of the property could not be leased, that should not be regarded a sufficient reason for a court of equity to step in and oust the probate court of its jurisdiction over the minors' property.

The decree will be reversed and the cause remanded, with directions to the circuit court to allow the partition proceedings to proceed in the ordinary manner.

*Decree reversed.*